UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES GARTEN,

    Plaintiff,         No. 05-CV-71435

-vs-               Paul D. Borman
                 United States District Judge

COMMISSIONER OF SOCIAL SECURITY,  Donald A. Scheer
                 Magistrate Judge

    Defendant.
_____/

**ORDER**
**ACCEPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;**
**AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMMARY JUDGMENT**

    Before the Court is Plaintiff's Objections to the Magistrate Judge's June 21, 2006 Report and Recommendation upholding the decision of the Administrative Law Judge in denying Plaintiff's application for social security benefits. For the following reasons, this Court ACCEPTS the Magistrate's Report and Recommendation.

**BACKGROUND**

    Plaintiff James Garten ("Plaintiff") sustained multiple injuries as a result of a work-related fall of twenty-five (25) feet from a roof on March 17, 1998. Plaintiff filed an application for social security benefits on January 20, 2000, claiming that he had become disabled due to a status post fracture of his right tibia, chronic headaches, mental depression, anxiety, and low intellectual functioning. An Administrative Law Judge ("ALJ") held a hearing concerning Plaintiff's application on August 14, 2003. On November 23, 2003, the ALJ determined that

1

Plaintiff did not qualify for social security benefits. On February 11, 2005, the Social Security Administration Appeals Council denied Plaintiff's request for review of that decision.

On May 18, 2005, Plaintiff filed his Complaint against the Commissioner of Social Security ("Commissioner") in this Court appealing the final administrative decision of his claim. Plaintiff filed his Motion for Summary Judgment on April 19, 2006. (Docket No. 22). The Commissioner filed its Motion for Summary Judgment on June 2, 2006. (Docket No. 26). The Magistrate Judge entered his Report and Recommendation for Summary Judgment in favor of Defendant on June 21, 2005. (Docket No. 29). Plaintiff filed his Objections to the Report on July 31, 2006. (Docket No. 34). Defendant Commissioner filed its Response to Plaintiff's Objections on August 29, 2006. (Docket No. 36).

Plaintiff claims that the following errors in the Magistrate Judge's Report and Recommendation show that the Magistrate's Report was not based upon substantial evidence:

(1) Misinterpretation of the medical evidence incorrectly by relying solely on the examination by Dr. Naik that Plaintiff did not have any systemic disorder affecting the joints to account for chronic pain. Furthermore, the ALJ failed to account for (a) the opinion of Dr. Nasser Sukhon who concluded that due to mental disorders, Plaintiff would be unable to work at a usual occupation or job or (b) the diagnoses made at the Clarkston Medical Group;
(2) Erroneous conclusion that by April 2001 Plaintiff had brought his anxiety under control;
(3) Concluding that by April 2001 Plaintiff had recovered from his chronic headaches;
(4) No consideration of the findings of Dr. Swistak with regard to Plaintiff's intellectual functioning as a result of the head injury that qualified him for Listed Impairment 12.05(C) (mental retardation);
(5) Failure to find that Plaintiff qualified for Listing 12.05(D) (organic mental disorder) through the testimony of Plaintiff and Plaintiff's mother;
(6) Not crediting to Plaintiff's own testimony of his symptoms and medical condition;
(7) Reliance upon the testimony of Dr. Green, a neurologist, for evidence regarding Plaintiff's orthopedic conditions;
(8) Error in determining that the Commissioner established the existence of jobs in the national economy that could accommodate claimant's known restrictions, by

2

giving more weight to Dr. Green's opinions than Plaintiff's treating physician, Dr. O'Neill.

## STANDARD OF REVIEW

This Court has jurisdiction to review a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3). This Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967). 42 U.S.C. § 405(g) states that the "findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive..." "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quotations omitted). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion...This is because there a 'zone of choice' within which the Commissioner can act, without fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).

## ANALYSIS

A person is considered disabled under the Social Security Act if "his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant has the burden to establish (1) the existence of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a

3

continuous period of not less than twelve (12) months and (2) that such impairment(s) render such claimant unable to engage in any substantial gainful activity. 42 U.S.C. § 1382c(3)(A), (B); *Daniels v. Comm'r of Soc. Security*, 70 Fed. Appx. 868, 871 (6th Cir. 2003) (unpublished).

Federal regulations provide five steps in evaluating whether a claimant can engage in any "substantial gainful activity."

> (1) The claimant must demonstrate that he or she is not currently engaged in any substantial gainful activity at the time of the disability application;
> (2) The claimant must show that he or she suffers from a severe impairment;
> (3) The claimant must demonstrate that his or her impairment meets the durational requirements in addition to meeting or equaling a listed impairment;
> (4) If claimant does not meet or equal a listed impairment, the Commissioner will review claimant's residual functional capacity and relevant past work to determine if the claimant can engage in past work – if he or she can, then the claimant is not disabled;
> (5) If the claimant cannot perform past work, then the Commissioner considers the claimant's residual functional capacity and his age, education, and work experience to see if he can make an adjustment to other work. If claimant cannot make an adjustment to other work, the Commissioner will find that the claimant is disabled.

20 C.F.R. § 404.1520(4); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### A.   The Findings of the Administrative Law Judge

In an August 14, 2003, an ALJ conducted a hearing upon a remand order by the Social Security Appeals Council. Plaintiff was a forty (40) year-old man with a tenth grade education. (Tr. p. 20).[1] His past work experience included employment as a construction laborer, carpenter, and skid builder. (Tr. p. 20). On March 17, 1998, Plaintiff was injured in a work-related fall. (Tr. p. 21). Plaintiff reported at the emergency room that he had landed on both feet from a twenty-five (25) foot fall and that he had also hit his head on a tree branch during the descent. (Tr. p. 21). X-rays of Plaintiff at the time revealed that Plaintiff had an acute non-displaced distal tibial

---

[1] All citations are to the Certified Transcript from the Office of Hearings and Appeals of the Social Security Administration.

4

fracture but no fracture on the left ankle or leg. (Tr. p. 21). Further X-rays of the lumbar spine, cervical spine, chest, and skull did not show any additional fractures. (Tr. p. 21). Additionally, a CT scan showed that that Plaintiff had a five centimeter scalp laceration. (Tr. p. 21). After several follow-up examinations for his head injuries and orthopedics, Plaintiff began walking again by July 23, 1998. (Tr. p. 22).

The following summarizes the medical evidence upon which the ALJ relied:

- July 23, 1998: Plaintiff saw Dr. Green for complaints of positional vertigo and daily headaches. Upon diagnosis, Dr. Green concluded that Plaintiff had a post-concussion syndrome. Dr. Green continued to see Plaintiff in regular follow-ups.

- December 15, 1998: Plaintiff reported that the headaches had decreased in frequency to three times per week, were less severe, and were relieved by Esgic Plus.

- May 25, 1999: After continuing treatments with Dr. Green, Plaintiff claimed that his vertigo had been resolved completely and that his headaches occurred only two days a week.

- January 25, 2000: An X-ray performed by the Clarkston Medical Group revealed that Plaintiff had mild degenerative changes in his knees but no acute fracture or dislocation.

- March 10, 2000: At the request of Disability Determination Services, Dr. Naik performed a consultative orthopedic examination. Plaintiff complained of pain and swelling in his ankles and knees with prolonged standing and walking and occasional swelling. Dr. Naik concluded that Plaintiff had essentially normal range of motion in his ankles with no swelling or deformity. Plaintiff did not have any swelling or deformity in his bilateral knees, but did have reduced flexion of 120/150 degrees.

- March 11, 2000: In a mental status examination, Dr. Zarski diagnosed Plaintiff with an adjustment disorder with a depressed mood and assigned a GAF of 60. The report indicated that Plaintiff was alert and oriented to time, place, and person and exhibited no significant problems with memory.

- August 4, 11, 2000: X-rays performed by the Clarkston Medical Group on Plaintiff's hip and lumbar spine revealed degenerative changes at the base of the femoral neck, disc space narrowing at L5-S1 and osteopania.

- September 1, 2000: A whole body scan performed by St. Joseph Mercy Hospital in

Pontiac, MI, revealed arthritis in the left knee, bilateral ankles, and bilateral wrists.

- October 18, 2000: In response to Plaintiff's complaints of headaches, dizziness, and blackouts, an MRI was performed at St. Joseph Mercy Hospital. The results were normal.

- January 11, 2001: Plaintiff consulted Dr. Green complaining that his headaches were becoming more severe and that he was avoiding going out into crowds because of panic attacks. Plaintiff's physical and neurological examinations were normal. Dr. Green diagnosed Plaintiff with muscle contraction cephaglia and a panic disorder and prescribed medication. In February 2001, Dr. Green switched Plaintiff's pain medication.

- March 11, 2001: An MRI was performed, and the results were normal.

- April 5, 2001: Dr. Green noted that Plaintiff had his panic attacks under control with his medication.

- March 15, 2002: Plaintiff reported that Vicodin relieved his headaches and that his dizziness was gone.

- September 2002: Plaintiff generally denied any side effects to his medications. Subsequent progress notes indicated the same.

- January 2003: Plaintiff reported that that he had stopped taking Pamelor because of dry mouth and a rash on his hands. Plaintiff was started on Paxil in February 2003.

- March 15, 2003: Plaintiff denied any adverse side effects to Paxil.

- June 19, 2003: Plaintiff reported that he was having side effects to Paxil. Dr. Green began to take Plaintiff off Paxil and start on Buspar. The diagnosis remained muscle contraction cephaglia.

- August 26, 2003: Plaintiff's attorney referred him for a psychological examination. Despite claiming difficulties with memory and concentration, Plaintiff's recent and remote memories were intact. Plaintiff had adequate expressive and receptive language skills, denied any type of hallucination or delusion, and his judgment and reasoning, and thought processes were intact. Dr. Swistak concluded that Plaintiff was operating in a borderline range of intelligence. Although Plaintiff had difficulty with the recall of complex information, his memory for simple information was satisfactory. Dr. Swistak's opinion was that Plaintiff was not capable of working given his current cognitive and physical state.

(Tr. p. 20-22).

6

Based upon the evidence, the ALJ concluded that Plaintiff did have the medically determinable conditions of depression, anxiety, status-post fracture of the right tibia, left deltoid strain, muscular tension headaches, and borderline to low average intellectual functioning. (Tr. p. 24). The impairments were "severe" within the meaning of the regulations but not severe enough the meet or equal any of the impairments in 20 C.F.R. Pt. 404, Subpt. P. App. 1. (Tr. p. 24).

The ALJ found that Plaintiff neither met the Mental Retardation requirements of Listing 12.05 nor the Organic Mental Disorder criteria in Listing 12.02. (Tr. p. 25). The ALJ noted that under Listing 12.05, Plaintiff was not diagnosed with a mental retardation prior to age twenty-two (22) under the regulations. (Tr. p. 25). Furthermore, Plaintiff was never placed in adult education classes and was successfully employed for many years as an adult. (Tr. p. 25). His neurological record also revealed no intellectual defects. Plaintiff did not meet Listing 12.02 since his MRI results were negative for brain damage. (Tr. p. 25). Dr. Green's diagnosis remained only a muscular contracture headache. (Tr. p. 25).

Since the ALJ found that Plaintiff's medical conditions did not qualify as an impairment, the ALJ inquired whether Plaintiff could perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. (Tr. p. 25).

The ALJ found that many of Plaintiff's statements and testimony were subjective complaints that were not fully credible. Plaintiff's post-concussion headaches improved less than one year after this fall. (Tr. p. 26). Plaintiff's physician Dr. Green found that Plaintiff's reported headaches of three or four times a week were relieved by Vicodin. (Tr. p. 26). Plaintiff made no effort to obtain counseling to treat his depression or anxiety. Although Plaintiff had radiological evidence of arthritis, the degenerative changes were considered "mild." (Tr. p. 26). The clinical findings demonstrated no significant problems in the range of motion of any joint. (Tr. p. 26).

7

Furthermore, the medical records revealed that Plaintiff did not complain of side effects to his medication; and if he did, the doctor changed the prescription to accommodate his complaints. (Tr. p. 26).

The ALJ considered the February 4, 2000 report of Plaintiff's primary care physician at the Clarkston Medical Group to the State of Michigan Family Independence Agency and decided to give it little weight. (Tr. p. 26). The form indicated that Plaintiff was restricted to sitting no more than four hours a day and could not stand or walk at all. (Tr. p. 392-93). The ALJ stated that the treating notes over the years did not provide support for such severe restrictions, thus gave the Clarkston Medical Group's report "no weight." (Tr. p. 26).

Giving "maximum reasonable weight" to Plaintiff's subjective complaints, the ALJ found that Plaintiff retained the residual functional capacity to perform less than a full range of light work with the following limitations: can lift twenty (20) pounds occasionally; ten (10) pounds frequently; requires a sit/stand option; can never climb; can occasionally balance; should avoid exposure to heights and moving machinery; requires work with routine production and stress, simple job assignments, and occasional contact with coworkers. (Tr. p. 27).

After finding that Plaintiff could not return to his past work, the ALJ shifted the burden to the Commissioner to show that there were other jobs existing in the national economy in significant number in the national economy consistent with his residual functional capacity, age, education, and work experience. (Tr. p. 27).

Based upon his findings, the ALJ found that Plaintiff could perform a significant range of light and sedentary work as defined in 20 C.F.R. §§ 404.1567 & 416.967. (Tr. p. 27). The ALJ relied upon an impartial vocational expert that testified that given Plaintiff's residual functional capacity Plaintiff could make a vocational adjustment to other work. (Tr. p. 27-28). The

8

vocational expert listed a significant number of qualifying jobs that Plaintiff could take given his medical impairments. (Tr. p. 26-28). From this the ALJ concluded that since there were a significant number of jobs in the national economy suitable for Plaintiff, there should be a finding of "no disability" under the Social Security Act. (Tr. p. 28).

### B.     The Magistrate Judge's Report and Recommendation

The Magistrate Judge recommended that Plaintiff's Motion for Summary Judgment be denied and that Defendant's Motion for Summary Judgment should be granted. The Magistrate Judge found that the decision of the ALJ was supported by substantial evidence since the Commissioner's decision to deny benefits was within the range allowed by law. The Magistrate Judge found Plaintiff's objections insufficient to demonstrate that the Commissioner failed to base his opinion on substantial evidence in the record.

### C.     Plaintiff's Objections to the Magistrate Judge's Report and Recommendation

#### 1.     *Evidence of Disability*

Plaintiff argues that the Magistrate Judge, in reaching the conclusion that the medical evidence did not support Plaintiff's claim of disability, ignored Plaintiff's head injuries and mental disorders. Plaintiff further asserts that the ALJ relied only upon one consultative examination with Dr. Naik to conclude that Plaintiff had no systemic disorder affecting the joints to account for the chronic pain. Plaintiff maintains that the ALJ ignored information on a "Medical Needs Form" from the State of Michigan Family Independence Agency completed by Dr. Sukhon in 2000 that Plaintiff had depression, a dysthymic disorder, and would be unable to work at a usual occupation or job. Furthermore, Plaintiff cites the findings of the Clarkston

9

Medical Group in 2000 that Plaintiff suffered from gastroesophageal reflux disease, arthritis, depression, in addition to residuary joint problems in the knees, femur, and ankles.

The Commissioner responds that the ALJ considered in detail the findings of Dr. Green who continued to provide Plaintiff treatment for his head injuries and headaches. Although the record reveals that Plaintiff complained of headaches in from 1998 to 2002, various medications worked to relieve the pain. The Commissioner further argues that the ALJ did not disbelieve the fact that Plaintiff was experiencing headaches but simply concluded that the headaches were not of the severity that would preclude him from performing work in the national economy. Contrary to Plaintiff's assertion that Dr. Naik only evaluated him on one occasion in a "consultative" manner, the Commissioner further points out that Plaintiff was referred to Dr. Naik specifically for an evaluation of disability in regards to foot and knee pain and depression. Dr. Naik examined Plaintiff and found that he had no swelling or deformity, that he had a nearly a full range of motion (except slightly decreased flexion on both knees), that he had no ankle irregularity, and that his neurological examination was normal. (Tr. 234-40).

Finally, the Commissioner points out that the State of Michigan Medical Needs form did not contain any basis for evaluating Plaintiff's conditions. The one-page printed form simply indicates that Plaintiff suffered from depression and a dysthymic disorder and that he could not work his current job or any other. (Tr. p. 389). Commissioner points out that Plaintiff has never sought psychiatric treatment and that the form does not indicate whether there was an ongoing treatment relationship between the two. (Tr. p. 241).

Based upon the record, the Magistrate Judge found substantial evidence that Plaintiff's headaches or closed head injuries did not preclude him from finding alternative employment. In addition to considering the ALJ's findings, the Magistrate Judge also noted several progress reports

in 2003 by Dr. Green that demonstrated that Plaintiff denied that he suffered any side effects from the medications prescribed to treat his joint pain and his anxiety. (Report & Recomm., p. 5-6). Dr. Green's evaluation further noted that Plaintiff did not have any problems walking nor in his bilateral symmetrical strength. The Court agrees with the Magistrate Judge that the ALJ's finding on this issue was supported by substantial evidence.

      2.      **Side Effects of Plaintiff's Medication & Anxiety**

Plaintiff argues that the ALJ did not take into consideration (1) the continuing nature of Plaintiff's headaches and (2) the side-effects of the medication for his headaches. Plaintiff cites to examples of his headache medication regimens, various side effects to certain drugs, and attempts by his treating physician to resolve the problems. In conjunction with these claims, Plaintiff avers that the Magistrate Judge did not account for Plaintiff's anxiety fueling his headaches. Plaintiff asserts that the Magistrate Judge and ALJ erred by not taking the continuing nature of his severe headaches into account when determining disability.

The Commissioner agrees that the ALJ did not find that Plaintiff's headaches were ever completely eliminated. In fact, the ALJ concluded that Plaintiff's muscular tension headaches were a severe impairment. (Tr. p. 24). At the same time, the ALJ recognized that medication at least partially controlled the severity of Plaintiff's impairment and his own complaints. (Tr. p. 24). Despite the severe impairment, the ALJ considered Plaintiff's ability to engage in a variety of daily activities and opinions of doctors that Plaintiff could perform work despite his impairments. (Tr. p. 27-28).

      3.      **Listings of Impairments Under Section 12.05**

Plaintiff argues that he meets the requirement for Listing 12.05(C) or (D) for the purposes of meeting the third prong of the "substantial gainful activity" test. Plaintiff additionally alleges that

the ALJ and Magistrate Judge did not give sufficient weight to the findings of Dr. Swistak that Plaintiff's learning disabilities had likely "preceded" his fall at age 35. As additional evidence, Plaintiff offers testimony from his mother from after the date of the accident as well as a Psychiatric Review Technique Form completed by psychiatrist Paul Liu.

> Listing 12.05 sets forth the requirements for showing mental retardation:
>
> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> ….
> (C)   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> Or
>
> (D)   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>    1.   Marked restriction of activities of daily living; or
>    2.   Marked difficulties in maintaining social functioning; or
>    3.   Marked difficulties in maintaining concentration, persistence, or pace; or
>    4.   Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P. App. 1

> The ALJ discussed his consideration of Dr. Swistak's findings:
>
> Dr. Swistak only saw Claimant on only one occasion. There was nothing in his report or the results of objective resting to support his statement that Claimant was not cognitively capable of working….Furthermore, Dr. Swistak was not qualified to evaluate Claimant's physical condition, as he is a psychologist and not a medical doctor. For these reasons, Dr. Swistak's opinion regarding Claimant's ability to perform the cognitive and physical requirements of work is given no weight.

(Tr. p. 24; 470-73).

The Magistrate Judge focused upon the ALJ's consideration of Dr. Kriauciunas, a state agency psychologist who evaluated Plaintiff in January 2002. Dr. Kriauciunas, a psychologist, concluded that Plaintiff had mild difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation due to any mental impairment. (R&R, p. 6-7). Furthermore, the Magistrate Judge properly found that the ALJ properly concluded from the record that Plaintiff could not show mental retardation during his developmental period before age twenty two (22). It is Plaintiff's burden to demonstrate that he meets all of the criteria of the listings in order to qualify as disabled. *Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990). This Court also notes that Plaintiff was able to perform his job duties before the accident unimpaired by his alleged pre-age 22 mental impairment. *See Foster*, 279 F.3d at 354-55 (holding where the plaintiff could not show the mental retardation before age 22 and where the plaintiff could perform her job before her accident at age 37, the plaintiff could not meet the criteria in Listing 12.05). Therefore, this Court finds that ALJ and the Magistrate Judge correctly applied the law on this point.

### 3. Credibility of Plaintiff's Subjective Complaints

Plaintiff claims that the ALJ did not give enough weight and credibility to Plaintiff's own testimony and his mother's remarks concerning his residual functional capacity in his decision to deny benefits. However, "[u]pon review, [the court is] to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court does] not, of observing witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Furthermore, the court's review of the ALJ's credibility determinations is limited to determining whether his "explanations for…discrediting [the claimant] are reasonable and supported by substantial evidence in the record." *Id*.

13

In making his determination, the ALJ discussed and weighed Plaintiff's various subjective complaints against the medical record. (Tr. p. 25-26). Plaintiff specifically claimed that he had side effects from Vicodin, including being off-balance. He stated that he could lift 35-40 pounds but lifting more caused more pain. He reported that he could only sit for 15 minutes because of pain in his knees and ankles and cannot stand for more than 5-10 minutes or walk more than five minutes due to ankle and knee pain. (Tr. p. 25).

As discussed above, the ALJ reasonably concluded that Plaintiff's subjective complaints were not supported by the medical record. The ALJ noted that Plaintiff's post concussion headaches improved less than a year after his fall. Dr. Green's diagnosis for Plaintiff was muscular contracture headaches that were relieved through Plaintiff's drug regimens. Furthermore, the ALJ pointed out that Plaintiff has not sought counseling or treatment for his alleged depression and anxiety. Finally, the evidence of Plaintiff's degenerative arthritic condition was diagnosed as "mild." Dr. Green's continuing progress notes do not document any significant problems with walking, sitting, or standing.

Hence, the Court finds that the ALJ reasonably weighed Plaintiff's subjective complaints in light of the credible medical record.

### 4. Other Employment in the National Economy

Plaintiff also claims the ALJ erred when he concluded that Plaintiff still enjoyed the residual functioning capacity to perform alternative employment in the national economy. Plaintiff again relies upon his physician, Dr. O'Neill, and the form the doctor completed for the State of Michigan Family Independence Agency in February 2000. On that form, Dr. O'Neill indicated that Plaintiff could occasionally lift six to ten pounds, could sit for four hours per day but cannot stand or walk during the day, could use his arms and hands with no problems, could not operate foot or leg

14

controls because of knee problems, had limited reading and writing abilities, and could not return to his usual occupation or any other work. (Tr. 391-92).

First, the Commissioner argues that the ALJ properly relied upon a vocational expert who testified that there were numerous unskilled assembly, inspection, clerical and sorting jobs that he could perform with minimal vocational adjustment. (Tr. p. 28). These jobs were low-stress and provided a sit-stand option and did not involve any climbing. (Tr. p. 28). These jobs also did not require performing complex tasks and did not involve direct contact with co-workers or supervisors. They also did not expose a worker to moving machinery or unprotected heights. (Tr. p. 28).

Second, the Commissioner points out that the ALJ properly weighed the December 21, 2001 findings of Dr. O'Neill, in light of all of the evidence presented. The ALJ accorded little weight to Dr. O'Neill's opinion since it was unsupported by treatment notes and was inconsistent with other findings in the record. 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particular medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The treating physician rule recognizes that "[i]n evaluating a claimant's alleged disability, medical opinion and diagnoses of treating physicians are entitled to great weight." *Buxton*, 246 F.3d at 773. The ALJ must give the treating physician great weight if he finds the opinion "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The ALJ "is not bound by the conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773. Finally, the ALJ must

15

give "good reasons" for failing to give controlling weight to the opinion of a treating physician. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The Court finds the Commissioner's argument persuasive. Plaintiff's evidence of Dr. O'Neill's medical opinion is a three-page standard State of Michigan Family Independence Form. Under federal regulations the information contained within is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques." The ALJ properly gave this finding by Dr. O'Neill its due weight in considering all of the medical evidence. *See Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 836-38 (6th Cir. 2005) (unpublished) (holding that where the ALJ properly noted where a treating physician failed to support or discuss his opinion and appeared to accept at face value the plaintiff's subjective complaint, the ALJ properly gave the findings little weight). The ALJ did not discount Dr. O'Neill's opinion completely but gave it weight when he made conclusions about the types of work that Plaintiff could perform. The ALJ additionally gave "good reasons" why he did not give controlling weight to Dr. O'Neill's opinion. The Court agrees with the Magistrate Judge and holds that the ALJ's finding that Plaintiff could find alternative employment in the national economy was supported by substantial evidence.

## CONCLUSION

**IT IS ORDERED** that Magistrate Judge Scheer's June 21, 2006 Report and Recommendation Denying Plaintiff's Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment is **ADOPTED** and **ENTERED**.

                                                s/Paul D. Borman  
                                                PAUL D. BORMAN  
                                                UNITED STATES DISTRICT JUDGE

Dated: October 2, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on October 2, 2006.

                                                s/Denise Goodine
                                                Case Manager